UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                           EASTERN DIVISION

EMMETT T. WINDSOR,              )
                                )
            Plaintiff,          )
                                )
      v.                        )    No. 4:06 CV 1310 DDN
                                )
PARKWAY SCHOOL DISTRICT,        )
                                )
            Defendant.          )

## MEMORANDUM

This action is before the court on the motions of defendant Parkway School District for summary judgment (Doc. 19) and to strike portions of the record (Doc. 25). The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 11.) A hearing was held on October 18, 2007.

## I. BACKGROUND

Plaintiff Emmett T. Windsor brought this action for wrongful termination against Parkway School District (Parkway) under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq. Windsor alleges he was fired on February 17, 2005, because of his disability and in violation of the ADA. He also alleges Parkway failed to reasonably accommodate his disability as required by the ADA. (Doc. 1.)

In its answer, Parkway denies discriminating against Windsor on account of his disability. The school district also denies that it failed to reasonably accommodate him. Instead, Parkway alleges the decision to fire Windsor was based on legitimate, nondiscriminatory reasons. (Doc. 5.)

## II. STATEMENT OF UNDISPUTED FACTS

Parkway hired Windsor as a school bus driver in October 2001. As a bus driver, Windsor's duties included driving students to and from school, and driving students to field trips, activity trips, and athletic events. (Doc. 1 at ¶ 6; Doc. 5 at ¶ 6.) During his employment

with Parkway, Nancy Davis served as the human resources manager and Michael Byrne served as the director of transportation. (Doc. 21, Ex. 1 at 1, Ex. 4 at 1.)

The 2004-2005 school year began on August 19, 2004. (Doc. 21, Ex. 3 at 3; Doc. 21, Ex. 5 at 3.) Windsor worked on the first day of school, but did not report to work on the second day of school, notifying the dispatcher that his knee was too sore to drive. (Doc. 21, Ex. 3 at 3.) Though it is unclear when he first scheduled the surgery, Windsor needed knee surgery. (Doc. 24 at 3; Doc. 27 at 3.) Normally, a school employee would have to fill out Family Medical Leave Act (FMLA) paperwork before the Board of Education (Board) would approve a leave of absence for medical reasons. (Doc. 21, Ex. 2 at 5.) Since Windsor had not worked enough hours in the past twelve months, he did not qualify for leave under the FMLA. (Doc. 21, Ex. 3 at 5.) For non-FMLA leave, the leave policy at Parkway is not as clearly defined. (Doc. 24, Ex. 2 at 2.) Generally, a doctor's note, explaining the reason for the medical leave and the date on which leave is to begin, would suffice for the Board to consider granting medical leave. ( Id. at 4.)

On August 31, 2004, Windsor's physician faxed a letter to Parkway, indicating Windsor would need to be off work from August 30, 2004, until approximately November 15, 2004. (Doc. 21, Ex. W at 24.) On September 23, 2004, the Board approved Windsor's medical leave, effective August 20, 2004. (Doc. 21, Ex. D at 1.) The letter from the Board did not specify a return date for Windsor. (See id.) The seven-member Board is also responsible for the hiring and firing decisions of the Parkway School District. (Doc. 21, Ex. 1 at 1.)

On September 15, 2004, Brenda Grayson, a human resources officer, sent Windsor a packet so he could apply for long-term disability benefits. (Doc. 21, Ex. T at 11-23.) As part of the application process, Windsor's physician, Dr. Joseph Ritchie, completed a statement of disability. (Id. at 20-22.) Dr. Ritchie noted Windsor had undergone a total replacement of his right knee on September 28, 2004, and would be off work for the next three months approximately. Parkway received copies of Windsor's disability application on October 25, 2004. (Id.)

Michael Byrne would have received this information. (Doc. 24, Ex. 2 at 6-7.)

In the three months following the surgery, Windsor did not discuss his return date with Byrne. (Doc. 21, Ex. 5 at 11, 13.) Windsor did speak at least with Grayson, but the topic of their discussions is unclear.[1] (Doc. 24, Ex. 2 at 13-14; Doc. 24, Windsor Aff. at 1.) Besides the application for long-term disability, Parkway did not receive any additional written correspondence from Windsor discussing a possible return date. (Doc. 24 at 9.) Still, Windsor did not have any formal responsibility for maintaining contact with Byrne during his leave of absence. (Doc. 24, Ex. 3 at 3-4.)

On January 3, 2005, Byrne sent Windsor a letter, noting he had now missed eighty-one of eighty-two school days for the year. According to Byrne, Windsor had verbally expressed a desire to return to Parkway, but Byrne had not received anything in writing from either Windsor or his doctor indicating if or when he could return to work. Byrne concluded his letter by stating,

> Knee replacement surgery typically requires a recovery period of six to eight weeks. So far, you have missed over 16 weeks of work - far beyond the norm for this procedure, and beyond the twelve weeks of job protection afforded by the Family and Medical Leave Act.
>
> By Monday, January 10, 2005, I either need to have a full release and have you back at work or, at the very least, a statement from your physician indicating the date that you will return to Parkway. Your continued employment with Parkway will be evaluated at that time.

(Doc. 21, Ex. E at 2.)

On January 10, 2005, Parkway received a fax from Dr. Ritchie. The hand-written note read, "Currently off work due to Rt total knee - unable to drive. Will have surgery on Lt knee 2/22/05. Could be up to 3 months." (Doc. 21, Ex. BB at 25.)

---

[1] In his affidavit, Windsor states he spoke with Grayson and Maria Partney "regarding various aspects of [his] medical leave." (Doc. 24, Windsor Aff. at 1). During her deposition, Davis said Windsor spoke with Grayson and Stacy Shannon, but wasn't sure what they discussed. (Doc. 24, Ex. 2 at 13-14.)

On February 10, 2005, Davis wrote a letter to Windsor, stating that she was recommending Windsor's termination to the Board effective February 17, 2005. Based on Dr. Ritchie's note and estimated recovery time, Davis wrote, Windsor would not be returning to work until near the end of the school year. It was Parkway's policy to fire an employee who is on paid disability without a workable return date, the letter concluded. (Doc. 21, Ex. F at 4.) On February 17, 2005, the Board approved Windsor's firing. (Doc. 21, Ex. G at 6.)

Because of spring sports and field trips, the spring semester at Parkway is an especially busy period for the transportation department. (Doc. 21, Ex. 3 at 12.) However, Parkway's transportation department had a procedure for accommodating open routes. When a driver has missed at least forty-five school days, or there is a reasonable expectation the driver will miss at least forty-five school days, the driver's route will be posted on the bulletin board and another driver may pick up the route.[2] (Doc. 24, Windsor Aff. at 4-5.) In addition, Parkway's Transportation Department issued a drivers' handbook that detailed the department's leave policy. According to the drivers' handbook, "[l]eave for other reasons may be granted without pay for a period not to exceed one year."[3] (Doc. 24-4 at 3-4.)

---

[2] In his affidavit, Windsor states that there were always a sufficient number of drivers to fill all the routes and that typically, "extra board" drivers were sent home without being used. (Doc. 24, Windsor Aff. at 1-2.) In his affidavit, Byrne states that during the busy Spring semester, Parkway uses all of its regular drivers and "extra board" drivers, as well as outside contractor drivers. In fact, Byrne states the district hired additional drivers in January and February 2005, due in part to Windsor's absence. (Doc. 21, Ex. 4 at 2.)

According to Byrne, "extra board" drivers are not available to cover long-term absences of regular drivers during the Spring semester. (Id. at 1-2.) "Extra board" drivers - in contrast to regular drivers - do not have regular routes. Instead, they cover the day-to-day absences of regular drivers, field trips, and other extracurricular activity routes. (Id.)

[3] Parkway moves to strike the drivers' handbook from the record. (Doc. 25.) For purposes of the motion for summary judgment, the undersigned will assume, without deciding, that the drivers' handbook is admissible.

-4-

On May 5, 2005, Windsor's attorney, Timothy Kellett, wrote to Davis, informing her that Windsor would be ready to return to work on May 22, 2005. (Doc. 21, Ex. H at 7.) A week later, Kellett informed Davis that Windsor could return to work on June 13, 2005. (Doc. 21, Ex. 1 at 2; Doc. 21, Ex. 5 at 16.) Parkway's lawyers, in turn, responded that Windsor had been fired. (Doc. 21, Ex. J at 9.) Later on, Windsor was told he could reapply for his job. (Doc. 21, Ex. K at 10; Doc. 21, Ex. 4 at 2.)

While employed, Windsor performed his job duties to satisfaction. (Doc. 24, Ex. 3 at 2.) Throughout his absence, Parkway officials never questioned the sincerity of his injuries. (Doc. 24, Ex. 2 at 14.) While he was injured, Windsor was not physically able to drive a bus from August 20, 2004, until at least February 17, 2005. (Doc. 21, Ex. 5 at 20-21.)

### III. SUMMARY JUDGMENT

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 785 (8th Cir. 2007). The court must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences. Devin, 491 F.3d at 785. A fact is "material," if it could affect the ultimate disposition of the case, and a factual dispute is "genuine," if there is substantial evidence to support a reasonable jury verdict in favor of the non-moving party. Die-Cutting Diversified, Inc. v. United Nat'l Ins. Co., 353 F. Supp. 2d 1053, 1054-55 (E.D. Mo. 2004).

Initially, the moving party must demonstrate the absence of an issue for trial. Celotex, 477 U.S. at 323. Once a motion is properly made and supported, the nonmoving party may not rest upon the allegations in its pleadings but must instead proffer admissible evidence that demonstrates a genuine issue of material fact. Fed. R. Civ. P. 56(e); Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800 (8th Cir. 2004); Krein v. DBA Corp., 327 F.3d 723, 726 (8th Cir. 2003).

## IV. DISCUSSION

In its motion for summary judgment, Parkway argues there are no genuine issues of material fact and Windsor cannot establish a prima facie case under the ADA. In particular, Parkway argues Windsor cannot demonstrate he is a qualified individual within the meaning of the ADA because he was unable to perform the essential functions of his job. In addition, Parkway claims Windsor never requested an accommodation. Even if he did request an accommodation, Parkway argues no accommodation would have allowed Windsor to perform the essential functions of his position. Finally, Parkway argues there is no liability for failing to participate in the interactive process. (Docs. 20, 27.)

In response, Windsor argues there are genuine issues of material fact, precluding summary judgment. First, Windsor argues the January 3, 2005, letter from Michael Byrne, dictating the length of a normal recovery, and an inaccuracy in Parkway's position statement to the EEOC, create issues regarding the district's motive or intent in firing him. Next, Windsor argues Parkway failed to follow its own procedures. Specifically, the Parkway Transportation Department provides for leave without pay for a period up to one year. Windsor also argues that there was no written policy discussing a "non-workable return to work date." Finally, Windsor argues that submitting the doctor's note on January 10, 2005, was a request for a reasonable accommodation and Parkway failed to participate in an interactive process with the plaintiff. Under the circumstances, a reasonable accommodation would have been to extend Windsor's medical leave of absence to cover both knee operations. (Doc. 24.)

**Americans with Disabilities Act**

Congress passed the ADA to provide a clear and comprehensive national mandate for the elimination of widespread discrimination against individuals with disabilities. 42 U.S.C. § 12101; PGA Tour, Inc. v. Martin, 532 U.S. 661, 674 (2001). Under the ADA, no employer may discriminate against a qualified individual with a disability, because of his disability, in regard to the firing of employees, and

other terms, conditions, and privileges of employment.[4]  42 U.S.C. §§ 12111, 12112(a).  The ADA also bars any employer from not making reasonable accommodations to the known physical limitations of an otherwise qualified employee with a disability, unless the employer can demonstrate the accommodation would impose an undue hardship on the employer's business operations.  42 U.S.C. § 12112(b)(5)(A).

**Discrimination under the ADA**

In ADA cases, a plaintiff may survive summary judgment by presenting direct or indirect evidence of discrimination.  Libel v. Adventure Lands of Am., Inc., 482 F.3d 1028, 1034 (8th Cir. 2007). Direct evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision.  Id.  This link must be sufficient to allow a reasonable fact finder to conclude that an illegitimate reason actually motivated the adverse employment action. Id.

If direct evidence is unavailable, the plaintiff may avoid summary judgment by creating an inference of unlawful discrimination under the Supreme Court's McDonnell Douglas analysis.  Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)).  To establish a prima facie case of discrimination under the ADA by indirect evidence, Windsor must show: (1) he has a disability within the meaning of the ADA; (2) he is qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) he suffered an adverse employment action.  Id.  Under the McDonnell Douglas approach, the plaintiff bears the burden of establishing a prima facie case of discrimination.  Id.

Once a plaintiff has established a prima facie case of discrimination, the employer may rebut the plaintiff's case by

---

[4]  The ADA provides, in relevant part, that

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.  42 U.S.C. § 12112(a).

-7-

articulating a legitimate, nondiscriminatory reason for its decision. Id. If the employer presents a nondiscriminatory reason for its decision, the plaintiff has the opportunity to demonstrate that the employer's offered reason is not the real reason for the employment decision. Id. Despite the burden shifting in McDonnell Douglas, the ultimate burden of proving disability discrimination remains at all times with the plaintiff. Cravens v. Blue Cross and Blue Shield of Kan. City, 214 F.3d 1011, 1016 (8th Cir. 2000). Summary judgment is proper if the plaintiff fails to establish any element of his prima facie case. Nesser v. Trans World Airlines, Inc., 160 F.3d 442, 445 (8th Cir. 1998).

**Disability within the Meaning of the ADA**

In his complaint, Windsor alleges he was fired because of his disability, in violation of the ADA. For the purposes of this motion, the court assumes, without deciding, that Windsor has a disability within the meaning of the ADA.

**Qualified Individual without a Reasonable Accommodation**

The plain language of the ADA provides that no employer "shall discriminate against a qualified individual with a disability . . . ." 42 U.S.C. 12112(a). An individual is qualified under the ADA if he satisfies the requisite skill, experience, education, and other job-related requirements of his employer. Rehrs v. Iams Co., 486 F.3d 353, 356 (8th Cir. 2007). To be qualified, he must also be able to perform the essential functions of his job, with or without reasonable accommodation. 42 U.S.C. § 12111(8); id. The employee must be able to perform these essential functions up to the time he was fired. See Browning v. Liberty Mut. Ins. Co., 178 F.3d 1043, 1048 (8th Cir. 1999).

Essential functions are fundamental job duties associated with the employment position. 29 C.F.R. § 1630.2(n)(1). The marginal functions of a position are not essential functions. Id. A job function may be considered essential because the position exists to perform that function. 29 C.F.R. § 1630.2(n)(2)(i). The employer's own judgment also influences which functions of a job are essential. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3)(i); Nesser, 160 F.3d at 446.

Regular and reliable attendance is a necessary element of almost any job. Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P., 444 F.3d 961, 966 (8th Cir. 2006). "An employee who is unable to come to work on a regular basis is unable to satisfy any of the functions of the job in question, much less the essential ones." Pickens v. Soo Line R.R. Co., 264 F.3d 773, 777 (8th Cir. 2001); see also Byrne v. Avon Prods., Inc., 328 F.3d 379, 381 (7th Cir. 2003) ("Not working is not a means to perform the job's essential functions."). This is true even when the absences are with the employer's permission. Schierhoff, 444 F.3d at 966. In Schierhoff, the plaintiff missed ninety-six days of work in a one-year period. Id. In Pickens, the plaintiff "laid off" from his job twenty-nine times in an eleven-month period. Pickens, 264 F.3d at 777. In each case, the Eighth Circuit found the level of non-attendance amounted to an inability to perform one's job. Schierhoff, 444 F.3d at 966.

In this case, Windsor had missed eighty-one days as of January 3, 2005. By February 17, 2005, Windsor had missed more than ninety-six days, an amount of work the Schierhoff court deemed inadequate to fulfill the essential functions of a job. Because of his inability to attend work, Windsor was unqualified to perform the essential functions of his job without reasonable accommodation.

**Qualified Individual with a Reasonable Accommodation**

Under the ADA, Windsor would still be a qualified individual if he could perform the essential functions of his job with a reasonable accommodation. 42 U.S.C. § 12111(8); Rehrs, 486 F.3d at 356. A reasonable accommodation is a modification to the work environment, or a modification to the manner in which the employee's position is usually performed, which would enable a qualified individual with a disability to perform the essential functions of the position. 29 C.F.R. § 1630.2(o)(1)(ii). For example, a reasonable accommodation might include making existing facilities readily accessible to and usable by individuals with disabilities. 42 U.S.C. § 12111(9)(A); 29 C.F.R. § 1630.2(o)(2)(i). Likewise, job restructuring, creating part-time or modified work schedules, reassignment to a vacant position, acquiring

or modifying equipment or devices, changing examinations, training materials, or policies, and providing qualified readers or interpreters, could be examples of reasonable accommodations. 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o)(2)(ii). To determine what type of reasonable accommodation might be needed, the employer may find it necessary to initiate an informal interactive process with the qualified and disabled individual. 29 C.F.R. § 1630.2(o)(3). When a qualified individual with a disability requests a reasonable accommodation, the employer must engage in the interactive process. Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 951 (8th Cir. 1999).

Windsor argues that extending his medical leave of absence would have been a reasonable accommodation. A leave of absence for medical care or treatment can be a reasonable accommodation. Browning, 178 F.3d at 1049 n.3; Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1247 (9th Cir. 1999); Cehrs v. Ne. Ohio Alzheimer's Research Ctr., 155 F.3d 775, 783 (6th Cir. 1998); Criado v. IBM Corp., 145 F.3d 437, 443 (1st Cir. 1998). The EEOC Compliance Manual supports this approach. See EEOC Compliance Manual, Vol. II, § 902 Intro. (June 2006), available at 2006 WL 4673363. "Permitting the use of accrued paid leave, or unpaid leave, is a form of reasonable accommodation when necessitated by an employee's disability." Id.; see also 29 C.F.R. Pt. 1630, App. ("[O]ther accommodations could include . . . providing additional unpaid leave for necessary treatment . . . .").

Requests for a leave of absence may be broken down into three relevant categories: 1) requests of a definite duration; 2) requests of an indefinite duration; and 3) successive requests.[5] See Stephen F. Befort, The Most Difficult ADA Reasonable Accommodation Issues: Reassignment and Leave of Absence, 37 Wake Forest L. Rev. 439, 464 (2002).

Requests for a leave of absence of a definite duration are often found to be a reasonable accommodation under the ADA. Criado, 145 F.3d at 444 (affirming verdict for plaintiff because she offered evidence tending to show her leave would be temporary); Rascon v. U.S. W.

---

[5] A fourth category, intermittent requests for leave, is not relevant to this discussion.

Commc'ns, Inc., 143 F.3d 1324, 1327, 1335 (10th Cir. 1998) (plaintiff's request for four-to-five months of treatment considered a reasonable accommodation); Powers v. Polygram Holding, Inc., 40 F. Supp. 2d 195, 200-02 (S.D.N.Y. 1999) (plaintiff's request for seventeen weeks of leave was not unreasonable as a matter of law, where plaintiff and his doctors gave a reasonable estimate of a return to work date and kept the employer aware of his work availability).  "[A] single, short absence from work does not prevent such an individual from being 'qualified' under the ADA . . . ." Stubbs v. Marc Ctr., 950 F. Supp. 889, 893 (C.D. Ill. 1997).  But to be reasonable, the plaintiff must present evidence of the expected duration of the impairment -- and not the duration of the leave request.  Hudson v. MCI Telecomms. Corp., 87 F.3d 1167, 1169 (10th Cir. 1996).  It is not enough for a physician to state that the plaintiff's injury or impairment is not permanent.  Id.

At the same time, the employer's obligations or requirements may make even a short and definite request for leave unreasonable.  See Epps v. City of Pine Lawn, 353 F.3d 588, 593 n.5 (8th Cir. 2003) (a six-month leave of absence would not be a reasonable accommodation where Pine Lawn was a small municipality and could not reallocate plaintiff's duties among its fifteen to twenty-two police officers); see also Stubbs, 950 F. Supp. at 893 (a one-month leave of absence was not a reasonable accommodation where plaintiff occupied a pivotal management position and absence was during a critical time of the year).  In all cases a reasonable accommodation is "most logically construed as that which presently, or in the immediate future, enables the employee to perform the essential functions of the job in question."  Myers v. Hose, 50 F.3d 278, 283 (4th Cir. 1995) (emphasis added).  Under Eighth Circuit precedent, the duty to accommodate does not arise "unless the employee will be presently qualified if afforded the accommodation."  Browning, 178 F.3d at 1049 n.3 (emphasis added).

For those reasons, requests for a leave of absence of an indefinite duration are often found not be a reasonable accommodation under the ADA, as a matter of law.  Wood v. Green, 323 F.3d 1309, 1312 (11th Cir. 2003); Walsh v. United Parcel Serv., 201 F.3d 718, 727 (6th Cir. 2000); Nowak v. St. Rita High Sch., 142 F.3d 999, 1004 (7th Cir. 1998);

Kinnaman v. Ford Motor Co., 79 F. Supp. 2d 1096, 1104 (E.D. Mo. 2000). An employer is not required to wait an indefinite period for an accommodation to achieve its intended result. Myers, 50 F.3d at 283. "The ADA does not require an employer to accommodate an employee . . . by allowing him an indefinite leave of absence." Nowak, 142 F.3d at 1004.

Successive leave requests represent a hybrid of the first two forms of leave. Befort, The Most Difficult ADA Reasonable Accommodation Issues, 37 Wake Forest L. Rev. at 464. On the one hand, successive requests for a determinate period resemble requests for definite leave. Haschmann v. Time Warner Entm't Co, L.P, 151 F.3d 591, 601-02 (7th Cir. 1998) (successive requests for two to four weeks of medical leave, a month apart, were for a clearly defined period and a jury could find the requests were a reasonable accommodation). "[A]n extension of an existing leave period, may be a reasonable accommodation if it does not pose an undue hardship on the employer." Nunes, 164 F.3d at 1247; see also Criado, 145 F.3d at 443 ("A leave of absence and leave extensions are reasonable accommodations in some circumstances."). On the other hand, the successive requests and inability to return to work share characteristics of requests for indefinite leave. See Duckett v. Dunlop Tire Corp., 120 F.3d 1222, 1224-26 (11th Cir. 1997) (per curiam) (after ten months of leave, the plaintiff's request for two more months of leave was not a reasonable accommodation since the plaintiff failed to show he could return to work within the two-month period). When an employer has already provided a substantial amount of leave, "an additional leave period of a significant duration, with no clear prospects for recovery, is an objectively unreasonable accommodation." Walsh, 201 F.3d at 727.

The cardinal question, therefore, is whether Windsor's successive requests for leave were requests of a definite duration or of an indefinite duration. In making this determination, the court must make an individualized assessment. Sch. Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 287 (1987). Determining whether a proposed accommodation is reasonable, including whether it imposes an undue hardship on the employer, requires a fact-specific inquiry. Nunes, 164

F.3d at 1247. "In the summary judgment context, a court should weigh the risks and alternatives, including possible hardships on the employer, to determine whether a genuine issue of material fact exists as to the reasonableness of the accommodation." Id. The determination of whether an individual is a qualified individual with a disability, within the meaning of the ADA, must be made at the time of the employment decision. Browning, 178 F.3d at 1048.

Looking to the undisputed facts of this case, Windsor's second request for a leave of absence was not a request of a definite duration. The request was therefore unreasonable as a matter of law. See Walsh, 201 F.3d at 727-28. When an employer has already provided a substantial leave of absence, any additional leave period of a significant duration, with no clear prospects for recovery, is an objectively unreasonable accommodation. Id. at 727. Indeed, a review of the case law reveals that the more definite and immediate the return date, the more likely the request for additional leave will be reasonable. The less definite and immediate the return date, the less likely the request for additional leave will be reasonable.

Windsor's leave of absence began on August 20, 2004, with an expected return date of November 15, 2004. Following his right knee surgery on September 28, 2004, his return date was pushed back to approximately three months post-operation. Yet, by January 3, 2005, Windsor had not returned to work and had not indicated he would be ready to return to work. On January 10, 2005, Windsor's doctor stated a second knee surgery was scheduled for February 22, 2005. The doctor's hand-written note said Windsor's absence "[c]ould be up to 3 months." The note also seemed to indicate that Windsor had still not fully recovered from his initial right knee surgery. In fact, there is no evidence on the record of when Windsor had fully recovered from his first knee surgery. This hand-written note was the only written correspondence between Windsor and Parkway until the time he was fired on February 17, 2005. Cf. Nunes, 164 F.3d at 1247 (request for an additional four or five months of leave, after an initial leave of two months, was not unreasonable as a matter of law, where plaintiff

-13-

submitted doctors' certifications to her employer, throughout the leave period).

Windsor's expected return date went from November 15, 2004, to late December 2004, and then into January 2005, before a subsequent doctor's note stated Windsor would not be returning to work until around May 2005. Ultimately, Windsor was unable to return to work until the middle of June 2005. In light of the uncertain recovery period for Windsor's first surgery, coupled with Windsor's failure to provide Parkway with any written notice of his progress or expected return date, the undersigned concludes that no reasonable finder of fact could conclude that Windsor's request for an additional leave period of "up to 3 months," after nearly five months of leave already, was of a definite and immediate duration. Looking to Browning, Windsor's request for additional leave would not have left him "presently qualified" to perform his job. Browning, 178 F.3d at 1049 n.3. The request for additional leave was therefore unreasonable as a matter of law. See Hudson, 87 F.3d at 1169 (where plaintiff has failed to present any evidence of the expected duration of the impairment as of the date of termination, a request for medical leave was unreasonable as a matter of law).

A case with similar facts supports this conclusion. See Altendorfer v. Kroll Ontrack, Inc., No. 04-4822 (JNE/SRN), 2006 WL 1314318, at *4-5 (D. Minn. May 12, 2006). In Altendorfer, Patricia Altendorfer requested six weeks of leave for after her September 12, 2003, surgery. Id. at *1. Her employer approved the initial leave of absence. Id. Complications arose, and on October 15, 2003, Altendorfer requested additional leave until November 19, 2003. Id. Her employer approved this request as well. Id. On November 12, 2003, Altendorfer forwarded a letter from her doctor to her employer, stating that she would not be able to return to work on November 19, 2003, but "may be ready to return to work in late December to early January." Id. at *2. On November 19, 2003, she was fired because of her inability to work. Id. On summary judgment, the court found the doctor's letter failed to establish a definite return date, and concluded that Altendorfer's request for additional unpaid leave was unreasonable as a matter of law.

-14-

Id. at *4, *4 n.1. As a result, Altendorfer failed to demonstrate she was a qualified individual within the meaning of the ADA. Id. at *5.

As noted above, Windsor's request for an additional leave of absence was unreasonable as a matter of law. Accordingly, no reasonable accommodation would have allowed him to perform the essential functions of his job at the time he was fired. Unable to perform the essential functions of his job, with or without a reasonable accommodation, Windsor was not a qualified individual under the ADA. 42 U.S.C. § 12111(8); Rehrs, 486 F.3d at 356. Windsor has therefore failed to proffer legally sufficient evidence to establish a prima facie case of discrimination under the ADA. See Libel, 482 F.3d at 1034.

**Parkway Transportation Department Policy**

The Parkway Transportation Department's drivers' handbook does not change this analysis. An employer is free to establish leave policies that exceed the requirements of the ADA. Myers, 50 F.3d at 284. At the same time, any such policy does not become the definitive source of the standard for measuring a reasonable accommodation under federal law. Id. A request for leave is not a reasonable accommodation, as defined by the ADA, just because the leave requested is authorized by the employer's leave policies. Cisneros v. Wilson, 226 F.3d 1113, 1131 (10th Cir. 2000). "A particular accommodation is not necessarily reasonable, and thus federally mandated, simply because the [employer] elects to establish it as a matter of policy." Myers, 50 F.3d at 284. The Parkway Transportation Department's leave polices do not create genuine issues of material fact. See id.

**FMLA Hours**

In response to Parkway's motion to strike, Windsor argues the school district failed to afford him leave under the FMLA. (Doc. 29 at 5.) In support, Windsor points to two pages of compiled numbers, with hand-written notations. (Id. at 8-10.) However, there is no indication of who compiled these hours, how accurately these hours were compiled, or over what period the hours were compiled. The document does not state that Windsor met the requirements for FMLA leave. Indeed, the

-15-

complaint never mentions any FMLA claims, and never alleges Windsor qualified for leave under the FMLA.  This argument does not raise any genuine issues of material fact.

**Failure to Reasonably Accommodate**

In his complaint, Windsor alleges Parkway failed to reasonably accommodate his disability.  Discrimination under the ADA includes the failure to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual, unless the accommodation would impose an undue hardship on the entity.  42 U.S.C. § 12112(b)(5)(A).  Since Windsor has failed to offer legally sufficient evidence to show he is a qualified individual under the ADA, Parkway had no duty to reasonably accommodate him.  See id.; see also Mack v. Great Dane Trailers, 308 F.3d 776, 783 n.2 (7th Cir. 2002).

**Failure to Participate in Interactive Process**

In his memorandum in opposition to summary judgment, Windsor argues Parkway's failure to participate in the interactive process precludes summary judgment.  When a qualified individual with a disability requests a reasonable accommodation, the employer must engage in a flexible, interactive process with the employee to determine the appropriate accommodation.  Fjellestad, 188 F.3d at 951.  However, since Windsor has failed to offer legally sufficient evidence to show he is a qualified individual under the ADA, Parkway had no duty to participate in an interactive process with the plaintiff.  See id.

**Intent in Firing Windsor**

Windsor also raises questions concerning Parkway's intent in firing him.  In particular, he points to inaccuracies in Parkway's position statement to the EEOC and the nature of Michael Byrne's letter.[6]  These

---

[6]Parkway moves to strike the position statement from the record. (Doc. 25.)  For purposes of the motion for summary judgment, the undersigned will assume, without deciding, that the position statement
(continued...)

issues do not speak to whether Windsor has established a prima facie case or proved he is a qualified individual under the ADA. This argument therefore does not present any genuine issues of material fact.

**Written Policy**

Finally, Windsor argues there was no written policy discussing a "non-workable return to work date." This argument also does not speak to whether Windsor has established a prima facie case or proved he is a qualified individual under the ADA. This argument therefore does not present any genuine issues of material fact.

## V. CONCLUSION

Windsor has failed to proffer legally sufficient evidence to prove he is a qualified individual under the ADA. The motion of defendant Parkway School District for summary judgment is therefore granted. The motion of defendant Parkway School District to strike portions of the record is denied as moot. An order in accordance with this memorandum is filed herewith.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on January 15, 2008.

---

[6](...continued)
is admissible.